IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

RAY CORNELIEUS CALVERT                                                           PLAINTIFF

v.                                      Civil No. 4:22-cv-04067-BAB

CAPTAIN GOLDEN ADAMS;
SERGEANT GOLDEN; and
SERGEANT HANNING;                                                                DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This is a civil rights action filed *pro* se by Plaintiff, Ray Cornelieus Calvert, under 42
U.S.C. § 1983.  On November 1, 2022, the parties consented to have the undersigned conduct all
proceedings in this case including a jury or nonjury trial and to order the entry of a final judgment
in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF No. 23).  Before the Court is
Defendants' Motion for Summary Judgment.  (ECF No. 37).  Plaintiff responded, (ECF No. 46),
and Defendants filed a Reply, (ECF No. 49).

### I.  PROCEDURAL BACKROUND

Plaintiff is currently incarcerated in the Miller County Detention Center in Texarkana,
Arkansas (hereinafter "MCDC").  His claims arose from incidents in 2021 and 2022.  Plaintiff
filed his original Complaint on July 28, 2022.  (ECF No. 1).  Plaintiff then filed an Amended
Complaint on August 12, 2022.  (ECF No. 7).  Plaintiff named three Defendants in his Amended
Complaint: Captain Golden Adams, Sergeant Golden, and Sergeant Hanning of the MCDC.  (ECF
No. 7).  Plaintiff's Amended Complaint sets forth five conditions of confinement claims, and
Defendants move for summary judgment on all of these claims.  (ECF No. 37).

1

First, in Claim One, Plaintiff alleges his Eighth and Fourteenth Amendment rights were violated through his conditions of confinement and cruel and unusual punishment by Defendant Golden.[1]  (ECF No. 7, p. 4).  Specifically, Plaintiff complains of black mold causing shortness of breath and dizziness (on December 3, 2021), green mucus and blood in his spittle (on July 18, 2022), and muscle and joint pain (on August 7, 2022).  *Id.*  Plaintiff goes on to allege he wrote a grievance regarding the black mold which Defendant Golden responded to with the following:

> "[W]e appreciate your concern regarding sanitation.  Please keep in mind that you are responsible for the cleanliness of your area.  We can assure you that adequate cleaning supplies are readily available upon request from the unit officer."

(ECF No. 7, p. 9).

When asked to state his official capacity allegations for Claim One Plaintiff states:

> Not following standards by giving access daily to cleaning solution and supplies to clean the bathroom.  Unsanitary living condition.  Serious health condition both short and long term.  Continuing to ignore these conditions putting lives in danger due to inhumane conditions.

> Not following proper standard of controlling and fighting Black Mol[d].  None of us are professional by trade to handle black mol[d].  By custom, policy, and widespread practice.  To handle "Black Mole," you must wear gloves, a face mask, coverall, and safety goggles.

> Exposure to black mold is cruel and unusual punishment inflicted.  Its toxic can be extremely dangerous to humans and may even begin to affect the nervous system and respiratory system.

(ECF No. 7, pp. 5, 10) (errors in original).

In Claim Two, Plaintiff alleges another condition-of-confinement claim under the Eighth and Fourteenth Amendment.  Plaintiff asserts Claim Two against Defendants Adams, Golden, and Hanning.  In Claim Two, Plaintiff alleges he began having shortness of breath and dizzy spells on

---

[1] Defendants argue, in their Motion for Summary Judgment, that Plaintiff alleges Claim One against all three Defendants.  This is not the case.  (ECF No. 7, pp. 4-5).  Therefore, the Court need not address any argument regarding Claim One against Defendants Adams or Hanning.

2

December 3, 2021.  Then, on April 17, 2022, he experienced headaches.  By July 18, 2022, he had a dry throat and was spitting up green mucus with blood.  (ECF No. 7, p. 5).  Plaintiff attributes these symptoms to a dirty ventilation system at the MCDC.  (ECF No. 7, p. 11).  When Plaintiff complained of the ventilation system he was told a work order was in progress on the issue.  *Id.*

Within Claim Two, Plaintiff also complains of the "air not working in cell-913 on Max-D." *Id.*  Plaintiff verbally told both Defendants Golden and Adams of this problem on an unknown date.  Plaintiff then wrote a grievance on the issue, but he did not get a response.  Plaintiff then wrote a second grievance to Defendant Hanning about the "HVAC system not having a supply and a return system.  How this is a major health hazard." *Id.*  Plaintiff further alleges Defendant Hanning failed to fix the air and ventilation system to meet the standard of a climate-controlled building. *Id.* at 12.

For his official capacity allegations under Claim Two Plaintiff states:

Access to proper Air, Lighting, Water, Nutritious food, and Fruits.  The standards of living according to Federal guidelines for State and Federal inmates are sub-standard.  Miller County Detention Center does not meet the health and Sanitation Standards and violate constitutional rights afforded by U.S. Constitution.

In a zoo, the standards for a animal must be maintained according to federal guidelines; those standards also apply to when it come to the housing of inmates as prisoners.

(ECF No. 7, p. 6, 13) (errors in original).  It is these official capacity allegations which make up the three additional conditions of confinement claims alleged by Plaintiff—no access to proper lighting, water, and nutrition.

Defendants filed their Motion for Summary Judgment on March 20, 2023 along with a Brief in Support and Statement of Undisputed Facts.  (ECF Nos. 37, 38, & 39).  In their Motion and Brief in Support, Defendants argue: (1) Plaintiff failed to exhaust his administrative remedies on his claims of nutrition, lighting, and water; (2) Plaintiff was not housed in unconstitutional

3

conditions of confinement; (3) Plaintiff suffered no injury in fact; (4) Defendants are entitled to qualified immunity; and (5) Plaintiff failed to state official capacity claims.  (ECF No. 38).

Plaintiff filed his Response on May 16, 2023.  (ECF No. 47).  In support of his Response, Plaintiff submitted a sworn Affidavit[2] (ECF No. 46) and a verified Statement of Disputed Facts (ECF No. 48).  Plaintiff argues there are disputed facts as to the existence of black mold and a dirty or poor air filtration system.  *Id.* at 2.  He also argues he exhausted his administrative remedies. Interestingly, Plaintiff states he did file a grievance about his diet, but his diet is not what he is "arguing in Claim 1 or Claim 2 . . . [the] argument is about the Black Mold problem in the showers and cells." *Id.* at 5.  However, in his Statement of Disputed Facts, Plaintiff does argue and submit factual disputes regarding his diabetic diet.  (ECF No. 48, p. 7-8).  Plaintiff then argues he was subjected to unconditional conditions of confinement when he was not provided cleaning supplies and proper access to clean air, and Defendants were deliberately indifferent regarding these conditions.  (ECF No. 47, pp. 5-9).

Defendants replied on May 24, 2023 arguing: (1) Plaintiff has not meet proof with proof; (2) he did in fact fail to exhaust his administrative remedies as to his claim of poor diet, lighting, and water; (3) Plaintiff's Response is unsupported, speculative, and only includes general conclusory statements or inadmissible evidence in support; (4) Plaintiff has no injury in fact; and (5) Plaintiff failed to show why Defendants are not entitled to qualified immunity.  (ECF No. 49).

---

[2] The Court notes Plaintiff included signed statements from other inmates within his sworn affidavit.  However, these inmate statements were not sworn under penalty of perjury, nor do they otherwise meet the requirements of a sworn affidavit.  Accordingly, the Court may not consider them as summary judgment evidence.  Fed. R. Civ. P. 56(c)(4).

## II.  FACTUAL BACKGROUND

At all times relevant, Plaintiff was a pretrial detainee held in the MCDC, for the U.S. Marshal Service, and all Defendants were employees at the MCDC—Defendant Golden a Seargent, Defendant Hanning the maintenance supervisor, and Defendant Adams the Captain. Plaintiff was booked into the MCDC on June 21, 2021.  (ECF No. 37-2, p. 1).  Plaintiff did not report any medical conditions upon booking into the MCDC.  (ECF No. 37-2, p. 10).

Plaintiff had a medical evaluation on July 1, 2021 in which no medical problems were reported by Plaintiff or documented by the examining nurse.  (ECF No. 37-4, pp. 7-8).  On July 21, 2022, Plaintiff had another medical evaluation by the same examining nurse.  In this medical history section it is noted, Plaintiff suffers from headaches, nervous disorder, hypertension, and kidney disease.  (ECF No. 37-4, pp. 4-5).  There is also a note that Plaintiff has pain in throat.  *Id.*

### A.  Black Mold

In her Affidavit Warden Walker, a nonparty to this case, explains background information to the complaints at issue here.  (ECF No. 37-1).  Sometime in 2019, Warden Walker observed dark places in the shower areas of the MCDC.  These places resembled mold and some inmates were alleging the spots to be mold.  To address the concern, Warden Walker ordered a testing kit from Mold Armor.  She took a sample of the dark spots, and following the instructions of the testing kit, allowed the substance to grow in her office for approximately one month.  Warden Walker then compared the test results to available pictures of molds and bacterial substances. Based on this comparison, Warden Walker determined the substance from the MCDC showers was a bacterium commonly known as candida—a common bacteria found in areas that stay wet. Warden Walker determined from this test that the substance was not black mold and not toxic. (ECF No. 37-1, p. 5).

5

Since Warden Walker's test in 2019, Defendant Hanning has been responsible for testing substances found in the showers at the MCDC. Defendant Hanning testifies in his Affidavit that he purchases commercial testing kits, swabs for the growth in the showers, and cultures the swab for twenty-four (24) hours. Defendant Hanning tests anytime someone notices an area of concern. To date, Defendant Hanning has no test results positive for black mold. Instead, the results are typically mildew, and that mildew is then removed with cleaning. (ECF No. 37-8, p. 3).

In his Statement of Disputed Facts, Plaintiff disputes that Defendant Hanning continues to test substances growing in the MCDC showers. Plaintiff states he has not seen Defendant Hanning come into his pod or zone to test since June 2021. (ECF No. 48, p. 13). Further, Plaintiff states he requested documentation, through discovery in this matter, of Defendant Hanning and Warden Walker's mold testing, e.g. emails, receipts of purchasing the tests, or test results. Defendants responded that no such documentation existed. *Id.* Defendants did not rebut this fact in their Reply.

Plaintiff filed his first grievance regarding black mold, on August 11, 2021, in which he complained of black mold in the shower of his "zone." Plaintiff further states in this grievance that the "cleaning solution" that is sent to the zone is not helping. (ECF No. 37-3, p. 3). The response from Admin G. Officer on the same day informs Plaintiff he is responsible for the cleanliness of his area and cleaning supplies were readily available upon his request. *Id.*

On October 17, 2022, Plaintiff filed another grievance regarding black mold. Plaintiff states black mold is growing in the showers in Max-A and other pods where he was previously housed. Plaintiff directs this grievance to Warden Walker and states he made a previous grievance, but it has never been addressed. Plaintiff also asks for the mold to be tested and treated. (ECF No. 37-3, p. 33). Sergeant Gutherie, a nonparty, responded on October 25, 2022 stating, Plaintiff

was responsible for the cleanliness of his own area and that adequate cleaning supplies were available upon request.  *Id.*  Plaintiff sent the same grievance to Defendant Adams, Lieutenant Miller, and Defendant Hanning.  (ECF No. 37-3, pp. 34-36).  There was no response as these grievances were deemed duplicates.  *Id*.

Warden Walker and Defendant Hanning both testified in their Affidavits that no inmates, that they know of, have contracted an illness from exposure to any substances in the showers at the MCDC.  (ECF No. 37-1, p. 6; 37-8, p. 4).  Plaintiff disputes this fact as he claims he has suffered illness because of his exposure to the substances in the MCDC showers, and he sought medical treatment from the MCDC medical staff for these symptoms.  (ECF No. 48, p. 15).

On December 3, 2021, Plaintiff submitted a medical request stating he was experiencing shortness of breath and having "dizziness spell."  (ECF No. 37-4, p. 47).  Plaintiff was examined the same day.  The examining nurse noted Plaintiff suffered from "dizziness, SOB, occasional headaches, no weakness, no numbness or tingling in any extremities, lung clear bilateral, regular heart rhythm."  *Id.* at 45.  Plaintiff was prescribed Ibuprofen and advised to stand up slowly or when changing positions, avoid lying flat, and to put in sick call if any new or worsening symptoms occurred.  *Id.* at 46.

On April 18, 2022, Plaintiff was examined for a Migraine by Nurse Davidson.  There were no notes made of any treatment provided for this Migraine.  (ECF No. 37-4, p. 35).

Plaintiff states in his Affidavit that he suffers from "extreme pain and discomfort cause[d] by headaches, body aches, spitting up blood, shortness of breath, and having dizziness spell[s] that are directly attributed to black mold."  (ECF No. 46, p. 2).

7

Sometime in 2022 or in January 2023, Officer Dancer was tasked with a team of trustees to spray and clean the showers daily at the MCDC.  (ECF Nos. 37-1, p. 5; 37-8, p. 3; 48, p. 12).[3]

The MCDC regular maintenance and cleaning schedule now requires the inmates to be provided with materials to clean their living area, including showers, daily.  According to Warden Walker's Affidavit this is more often than the once a week "it used to be."  (ECF No. 37-1, p. 4). There is no indication in Walker's Affidavit as to the date the MCDC transitioned to daily cleaning. The inmates are provided with a mop, broom, and a water-diluted bleach solution.  *Id*.

Plaintiff does not dispute the change from weekly to daily in cleaning material availability or the implementation of Dancer's daily shower cleanings.  Instead, he argues it shows that for sixteen (16) months he was only able to clean his area once a week—August 11, 2021 to January 1, 2023.  (ECF Nos. 46, p. 3; 48, p. 2).  Further, Plaintiff disputes cleaning materials are available every day.  He states cleaning materials are not available on the weekends.  *Id.* at 7.  Defendants did not rebut this fact in their Reply.

Plaintiff also states Defendants use a cleaning product called Prordix.  According to Plaintiff, this is a mold killing cleaning product.  (ECF No. 48, p. 15).  Defendants did not rebut this fact in their Reply.

### B. Ventilation

Plaintiff filed his first grievance regarding the ventilation system on August 17, 2021.  He complained the ventilation system on the "POD/UNIT" was filled with dirt and not cleaned.  He goes on to state that living on the pod feels as if he is being suffocated due to the poor ventilation

---

[3] Plaintiff argues Warden Walker lied in her Affidavit as to the date Officer Dancer started cleaning the showers. Plaintiff states Dancer told him personally he began doing the showers in January 2023.  (ECF No. 48, p. 12).  However, Walker's Affidavit states Dancer began managing the trustees and spraying the showers in 2023.  (ECF No. 37-1, p. 5).  Defendant Hanning's Affidavit states Dancer started this task in 2022.  (ECF No. 37-8, p. 3).

system and lack of fresh air circulation.  (ECF No. 37-3, p. 5).  On August 19, 2021 Admin G. Officer replied: "[a] work order has already been put in and we are actively trying to get this fixed." *Id*.

On June 19, 2022, Plaintiff filed a grievance stating the air was not working in Max-D, cell 913 and it was so "hot all the time."  Defendant Adams replied he was advised of the issue the day before and maintenance was advised.  (ECF No. 37-3, p. 9).

On June 21, 2022, Plaintiff filed a third grievance regarding the HVAC system, and specifically complained that there was not a "supply and return" in each cell.  He states it feels as if he is being suffocated due to lack of air.  (ECF No. 37-3, p. 10).  The grievance was closed without a response on February 28, 2023.  *Id.*

On July 18, 2022, Plaintiff submitted a medical request form stating: "my throat have a dry feel and hurting.  I'm spitting up green stuff and sometime[s] it [has] a little blood in it."  (ECF No. 37-4, p. 20).  Plaintiff was examined the same day by the MCDC nurse, and prescribed "Amoxil" and "Ibu" which the Court interprets as Amoxicillin and Ibuprofen.  (ECF No. 37-4, pp. 18-19).

Plaintiff states in his Affidavit that "the lack of clean air cause dry throat, shortness of breath, headache, and dizziness are attributed to poor ventilation."  (ECF No. 46, p. 3).

On August 1, 2022, Plaintiff filed another grievance regarding the hot temperatures in his cell.  He claims it feels like 90 degrees inside.  (ECF No. 37-3, p. 21).  Non-party, Sergeant Gutherie, responded, on August 2, 2022, that the ambient air temp in the pod was 75-76 degrees. *Id.*

Defendant Hanning testifies in his Affidavit that Plaintiff cannot see the HVAC system from his cell or within the MCDC.  According to Defendant Hanning, what Plaintiff sees is dusty

air vents which Plaintiff may clean off with the cleaning materials he is provided if he wishes to do so.  (ECF No. 37-8, p. 5).  Defendant Hanning goes on to testify: the HVAC system at the MCDC is continually and regularly maintained in accordance with accepted standards and he knows of no issues with the system.  *Id.*

Plaintiff does not dispute that it is the "vent duct" that is visibly dirty.  (ECF No. 48, p. 3). In Plaintiff's Statement of Disputed Facts, he also states the MCDC does not have windows that can be opened.  Therefore, he relies on the MCDC's HVAC system.  *Id.*  He also admits he is not a licensed HVAC professional.  Plaintiff asserts, nonetheless, he is not getting fresh air since the MCDC's HVAC system does not have a proper supply and return system or climate control in the building.  *Id.*  Additionally, Plaintiff contests the ambient air temperature in his pod was 75-76 degrees on August 2, 2022.  Plaintiff states the temperature outside during that time was "mid to late 90s."  Therefore, he contends, there is "no way the ambient air temp" inside the MCDC maintained at 75.  *Id.*  Lastly, Plaintiff states the break-down of the air system stems from poor maintenance and remains a problem.[4]  *Id.*

### C.  Nutritious Food

Plaintiff's medical records on the summary judgment record indicate Plaintiff was diagnosed as a diabetic on June 28, 2022.[5]  (ECF No. 37-4, p. 25).  On June 30, 2022, Plaintiff was examined as a "new diabetic."  (ECF No. 37-4, p. 23).  There are "Blood Sugar Flow Sheet[s]" which record Plaintiff's blood sugar multiple times a day thereafter.  (ECF No. 37-4, pp. 12, 13, 16, 17, 21, 22).

---

[4] Plaintiff also makes additional arguments regarding pods he is not housed in and incidents which occurred after he filed the instant suit.  The Court will not consider either as they are not related to Plaintiff's Complaint.

[5] The explanation within the lab result document indicated anything above 6.4 as diabetes and Plaintiff's A1C was 12.0.  (ECF No. 37-4, p. 25).

On August 3, 2022, Plaintiff filed his first grievance regarding his status as a diabetic and the food provided on his tray.  In the grievance, Plaintiff alleges the kitchen is disregarding what is healthy for a diabetic and states he refuses to eat what is provided.  He requests the kitchen change the way it is feeding him.  (ECF No. 37-3, p. 11).  The kitchen responded on the same day stating the inmate was told he gets the food approved by the dietician, and if he does not like it, he can eat from commissary.  *Id.*

On the same day, Plaintiff filed another grievance regarding his food tray.  He states he will be calling the U.S. Marshal service to report how the kitchen at the MCDC is not following the proper way to feed diabetics.  (ECF No. 37-3, p. 25).  The kitchen responded on the same day telling Plaintiff, he could not have what he wanted, and he was receiving what the state required. *Id.*  Plaintiff then filed a third grievance related to the food provided on August 3, 2022.  (ECF No. 37-3, p. 26).  Plaintiff states he is putting the kitchen on notice he is informing the U.S. Marshal that he is not being fed proper food for a diabetic.  The kitchen responded on the same day stating Plaintiff has a right not to eat his tray.  *Id.*  Finally, also on August 3, 2022, Plaintiff filed a fourth grievance requesting the name of the dietician who approves the diabetic diet.  (ECF No. 37-3, p. 37).  The kitchen refused to provide the information to Plaintiff.  *Id.*

Al Landreth, Jail Administrator of the MCDC at the time in issue, testified in his affidavit:

> I have reviewed [Plaintiff's] grievances.  He grieved a claim of mold, a claim of air filtration system.  He filed a grievance that he rejected his tray because he did not think it was proper for diabetics but failed to give specifics that would allow MCDC to investigate, failed to give any remedy that he was seeking that would allow MCDC to solve the issue.  He did not file any grievance about proper lighting or water (other than asking for hot water) that would satisfy our grievance system.

(ECF No. 37-9, p. 3) (errors in original).  However, Mr. Landreth went on to further testify how the MCDC officials investigated Plaintiff's claims regarding his tray:

> We have a contract with a registered dietician who approves all meals, including those for the diabetics.  As noted in the "grievance" submitted by [Plaintiff] about his diabetic trays, the staff discussed the concerns with the dietician and it was confirmed that he was receiving a properly nutritious meal sufficient for diabetics.

(ECF No. 37-9, p. 4) (errors in original).

In Plaintiff's Statement of Disputed Facts, he contends, the MCDC does not have the diabetic trays approved by a registered dietician.  (ECF No. 48, p. 7).  Plaintiff further states the blatant disregard to diabetic's health, such as Plaintiff's, is in violation of the MCDC policy and procedure to maintain the health of its inmates.  *Id.* at 10.

### D.  MCDC Policy and Procedures

Defendants state no policy or procedure related to any of Plaintiff's claims are being violated.  (ECF No. 37-1, p. 6).  Plaintiff disputes this fact.  (ECF No. 48, p. 16).

The MCDC has a grievance procedure that requires, among other things, for the Plaintiff to present specific facts and circumstances directly related to his complaint in his grievance, state the remedy which he seeks, and state what the original complaint addressed.  (ECF No. 37-5, p. 6).

Plaintiff states in his Statement of Disputed Fact that he admits the MCDC has a grievance procedure, but disputes that all detainees are given a copy of the procedure or have access to the written policy and procedure on how to file grievances.  Additionally, Plaintiff notes many of his grievances were marked as "Not Grievances" and could not be appealed.  (ECF No. 48, p. 6).  Plaintiff did not dispute the fact he failed to exhaust his claims regarding the lights and water.

The MCDC has a standard operating procedure for facility maintenance.  (ECF No. 37-5, p. 11).  This procedure states:

> It is the policy of the MCDC to ensure all equipment and fixtures in the [MCDC] are in safe, operable condition and meet the minimum standards of local, state and/or federal codes.  The Warden, or designee, will ensure that schedule for the maintenance and

12

inspection of all such equipment and fixtures is developed and followed by maintenance personnel.

*Id.*  Plaintiff does not dispute this policy.

The MCDC has a standard operating procedure for sanitation and hygiene.  (ECF No. 37-5, p. 13).  This procedure states:

It is the policy of the [MCDC] to provide staff and inmates with a clean, sanitary living environment consistent with all applicable codes, Arkansas Criminal Detention Facility Standards, and sound correctional practices.

*Id.*   The procedure also provides for: weekly sanitation inspections; all floors in the facility should be swept and mopped daily; inmates are assigned housekeeping chores requiring they clean their housing areas; a cleaning crew of sentenced inmates will clean facility daily by sweeping, vacuuming, mopping, cleaning windows, and dusting; and unsanitary conditions shall be reported by staff.  *Id*. at 13-15.

Plaintiff contends in his Statement of Disputed Facts that the MCDC does not comply with this procedure because Officer Dancer (nonparty shower sprayer) does not work on the weekends and the inmates are not given cleaning material on the weekends.  Therefore, the showers and pods do not get cleaned on the weekends.  (ECF No. 48, p. 9).

The MCDC has a standard operating procedure related to facility inspections.  (ECF No. 37-5, p. 30).  This procedure states:

It is the policy of the [MCDC] to obtain independent environmental health audits and inspections on a periodic basis to ensure Jail operations are in compliance with all applicable regulations, statutes, and standards.  To that end, staff shall maintain documentation of required inspections and audits provided by independent, qualified resources attesting that the Jail complies with applicable federal, state, and local life safety and related requirements.

*Id*.  Plaintiff did not dispute this policy.

13

The MCDC has a standard operating procedure related to food services.  (ECF No. 37-11).
This procedure states:

> It is the policy of the of the [MCDC] to provide inmates with three (3) nutritious meals per
> day that are developed by a certified dietician, prepared under sanitary conditions, which
> are palatable, use established dietary standards, at a reasonable cost and in such a manner
> that meets established governmental health and safety codes.

*Id.*  As explained in more detail above, Plaintiff disputes that the diabetic trays are approved by a
registered dietician.

### E.  MCDC Inspections

On November 16, 2021, the MCDC was inspected by the Department of Corrections
Criminal Detention Facilities Review Committees (hereinafter "Inspector").  (ECF No. 37-6).  This
inspection noted the MCDC menus were approved by a dietician, the lighting in the facility was
adequate, and the temperature was maintained at a proper level.  *Id.* at 7, 9.  The Inspector also
notes the Health Department Inspection was current at the time this inspection report was issued.
*Id.* at 2.  There is nothing mentioned by the Inspector regarding mold or the general cleanliness at
the MCDC.  However, the Inspector notes the heating the cooling systems appear to be aging at a
more rapid pace due to lack of space and growing inmate population.  *Id.* at 3.

On July 28, 2022, the MCDC was again inspected by the Inspector.  (ECF No. 37-7).
Again, the Health Department Inspection was marked current.  *Id.* at 2.  However, in this
inspection, the Inspector notes the kitchen system is struggling as employees work to meet/provide
food plan goals.  *Id.*  However, the menus were noted as approved by a dietician and food services
in general were marked in compliance.  *Id.*  at 6.  The Inspector also noted the heating and cooling
systems appear to be aging at a more rapid pace due to lack of space and a growing inmate
population.  *Id.* at 2.  Lighting and temperature were also marked in compliance.  *Id.* at 8.

Plaintiff disputes the findings of these two inspection reports.  (ECF No. 48, p. 17).  He states the Inspectors did not come into Max A, B, C, D, or E pods; and they lied about the lighting system which was not fixed.[6]  *Id.* at 18.

Additionally, Defendants Adams and Hanning along with nonparty Warden Walker conduct monthly walk throughs of the MCDC to review maintenance issues.  (ECF No. 37-1, p. 4).  Plaintiff disputes this fact stating Warden Walker has not conducted a monthly walk through with Defendant Adams in over six months.  (ECF No. 48, p. 10).  Plaintiff is not clear as to whether Defendant Adams and Hanning are conducting the walk throughs without Warden Walker.

### III.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607.  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610.

---

[6] Plaintiff listed other issues regarding the Inspector's reports, but the Court need not consider them here as they are unrelated to Plaintiff's claims.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.  DISCUSSION

To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

While Plaintiff only labels two claims in his Amended Complaint he alleges five separate conditions of confinement claims against Defendants: (1) the existence of toxic black mold; (2) the insufficiency of the HVAC system or poor ventilation; (3) the deprivation of an appropriate diabetic diet; (4) the lack of adequate lighting; and (5) the lack of water at the MCDC.  Plaintiff alleges the black mold claim against Defendant Golden in his individual and official capacities. Plaintiff does not assert this claim against any other Defendants.  Plaintiff alleges the poor ventilation claim against all three Defendants in both their individual and official capacities. Plaintiff alleges the diet, lighting, and water claims against all three Defendants in their official capacities only.

### A.  Conditions of Confinement Standard

As an initial matter, the Court must address the insufficiency of the summary judgment record before it and the standard of law applied to conditions of confinement claims in the Eighth Circuit.  In 2020, the Eighth Circuit clearly established that the Fourteenth Amendment standard, and not the Eighth Amendment standard, applied to conditions of confinement claims.

16

In *Stearns v. Inmate Servs. Corp., et al.,* 957 F.3d 902 (8th Cir. 2020), the Eighth Circuit clarified that, despite some prior inconsistencies in its cases, the deliberate indifference standard of the Eighth Amendment did not apply to conditions of confinement cases brought by pretrial detainees. Instead, the Eighth Circuit held in *Stearns* that the claims of pretrial detainees must be analyzed under the Fourteenth Amendment as set forth in *Bell v. Wolfish*, 441 U.S. 520 (1979). In *Bell*, the Court stated that "the proper inquiry is whether [the] conditions amount to punishment of the detainee." *Id.*, 441 U.S. at 535. The Eighth Circuit in *Stearns* stated:

> In *Bell v. Wolfish*, the Supreme Court articulated the standard governing pretrial detainees' claims related to conditions of confinement. The Court held that the government may detain defendants pretrial and "may subject [them] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536-37. The Court articulated two ways to determine whether conditions rise to the level of punishment. A plaintiff could show that the conditions were intentionally punitive. *Id.* at 538. Alternatively, if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose. *Id.* at 538-39. If conditions are found to be arbitrary or excessive, it is permissible to "infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539.

*Stearns*, 957 F.3d at 907 (alterations in original) (citations omitted). In short, the Constitution prohibits conditions for pretrial detainees that: (1) are intentionally punitive; (2) are not reasonably related to a legitimate governmental purpose; or (3) are excessive to that stated purpose. *Id.* "In considering whether the conditions of pretrial detention are unconstitutionally punitive, we review the totality of the circumstances of a pretrial detainee's confinement." *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010).

While Defendants initially rely on the *Sterns* stated standard and argue Plaintiff must establish the alleged conditions constituted punishment, they subsequently shift to a deliberate indifference analysis. Defendants argue the second prong of the conditions of confinement test for pre-trial detainees dovetails with the Eighth Amendment conditions of confinement

jurisprudence requiring that the alleged unconstitutional condition result from deliberate indifference.  Defendants rely on *Smith v. Copeland,* 87 F.3d 265 (8th Cir. 1996) for this analysis.  However, *Copeland* was decided prior to *Stearns*, and the Court reads *Stearns* to clarify the previous inconsistencies and applications of the deliberate indifferent standard to condition of confinement claims of pretrial detainees.  *See Stearns,* 957 F.3d at 907-908.

In *Stearns,* the Eighth Circuit explains in detail that the Eighth Amendment subjective deliberate indifference standard is not applicable to pretrial detainee conditions of confinement claims.  The *Stearns* Court goes as far as advising that dicta in *Zefferi* should not be relied upon when a clear standard was established by *Bell*.  Furthermore, the *Sterns* Court provides examples of precedent where the deliberate indifference standard was not applied and instead the Eighth Circuit applied an objective Fourteenth Amendment standard to determine whether the facts alleged were reasonably related to a legitimate governmental interest and if the conditions were excessive in relation to that interest.  *Id.* (citing *Morris,* 601 F.3d at 811; *Haslar v. Megerman*, 104 F.3d 178, 179-80 (8th Cir. 1997)).  Finally, the Court notes district courts, in both the Eastern and Western Districts of Arkansas, have applied the Fourteenth Amendment standard, as clarified in *Stearns*, to pretrial detainee conditions of confinement claims since 2020.  *See e g., McAllister v. White*, Civil No. 4:22-cv-01047, 2023 WL 9316142 (E.D. Ark. Dec. 20, 2023); *Deweese v. White,* Civil No. 4:22-cv-01048, 2023 WL 9316144 (E.D. Ark. Dec. 20, 2023); *Hutchison v. Smith,* Civil No. 4:20-cv-00779, 2022 WL 4089457 (E.D. Ark. Jun. 16, 2022); and *Mayfield v. Raymond*, Civil No. 3:20-cv-03007, 2020 WL 7714715 (W.D. Ark. Dec. 29, 2020).

Because of the confusion over the applicable standard and the resulting arguments made, the Court is unable to address whether there are genuine issues of fact as to the existence of a constitutional violation as it relates to Plaintiff's claims of black mold and the ventilation system

at the MCDC.  Specifically, there are no arguments from either party regarding the punitive nature of the conditions, any legitimate governmental purpose, or the relationship of the alleged conditions to that proposed purpose.  The Court recognizes the Eighth Circuit precedent is confusing regarding the applicable standard to pretrial detainee claims.[7]  This is evident here as both parties reference and even argue for an Eighth Amendment cruel and unusual punishment claim or deliberate indifference analysis.[8]  While the Court believes *Stearns* adequately quelled any confusion as to conditions of confinement claims, rather than rule on an insufficient record, it will deny, without prejudice, the summary judgment motion as to the black mold and ventilation claims to allow the parties to reassert their arguments using the appropriate support and reasoning.[9]  The Court will, however, address Defendants arguments of exhaustion and injury in fact on the instant record.

## B.  Exhaustion

---

[7]  In prisoner litigation, courts in the Eighth Circuit analyze pretrial detainee denial of medical care claims under the deliberate indifference standard of the Eighth Amendment.  *See e.g., Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020) (pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment).  C*ompare Stearns*, 957 F.3d at 907 (stating language in *Zefferi,* 601 F.3d 8050 (8th Cir. 2010), which stated pretrial detainees are entitled to at least as much protection as that afforded convicted prisoners under the Eighth Amendment, was dicta and should not be relied upon to change the Fourteenth Amendment punishment standard for conditions of confinement claims).

[8]  The Court notes Plaintiff also references an Eighth Amendment cruel and unusual punishment standard in his Amended Complaint and Response with supporting documents.  (ECF Nos. 7, 46, 47, 48).

[9]  The Court notes Defendants also argue Plaintiff may not rely solely on his own self-serving affidavits or hearsay statements to meet proof with proof.  However, the only evidence Defendants produce to support their contention that black mold does not exist and the ventilation system is adequate are the Affidavits of Warden Walker and Defendant Hanning and the Inspection Reports.  The Inspection Reports do not address the conditions directly.  Accordingly, the Court will not weigh evidence or determine the credibility of the parties' appropriately submitted Affidavits at summary judgment.  Fed. R. Civ. P. 56.

The parties do not dispute the MCDC has a grievance procedure, and that said grievance procedure requires the Plaintiff to present specific facts and circumstances directly relating to his complaint, state the remedy which Plaintiff's seeks, and what the original complaint addressed. Furthermore, the parties do not dispute that Plaintiff failed to file any grievances regarding his claims related to the lighting and water at the MCDC.  The parties dispute, however, if Plaintiff exhausted his claim related to the diabetic diet tray he was provided at the MCDC.

The PLRA mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) of the PLRA provides: "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U. S. C. § 1997e(a) (held unconstitutional on other grounds).  Exhaustion is mandatory. *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002).

The parties do not dispute Plaintiff failed to file any complaint or grievance within the MCDC grievance procedure regarding lighting or water.  Clearly, Plaintiff failed to exhaust his remedies regarding these claims.  Accordingly, all of Plaintiff's claims as they relate to lighting and water should be dismissed.

Whether Plaintiff exhausted his diet claim requires more consideration.  Defendants argue Plaintiff's grievances related to his tray and diabetic diet were not sufficiently specific to allow Defendants to establish any constitutional violation or allow MCDC to investigate.  The Court disagrees.

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id.* at 218 (internal quotation marks and citation

omitted).  The *Jones* Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Id.*

The MCDC grievance procedure requires Plaintiff to present specific facts regarding his complaint, to state what remedy he seeks, and to state what his original complaint was.[10]  As evident in Plaintiff's Grievance #12,497,541, Plaintiff stated his complaint that he is unable to eat the food provided because it is bad for diabetics.  Then he requests the kitchen change the way it

---

[10] The MCDC grievance policy and procedure requires additional steps and elements than what is listed here in order to exhaust administrative remedies. (ECF No. 37-5, pp.1-7).  However, Defendants do not assert any other reasons than lack of specificity in their failure to exhaust argument.  Accordingly, the Court will only address the arguments moved upon.  The Court additionally notes there is no difference in the format of the complaints, or the avenue used for submission by Plaintiff on any of the subject claims—black mold, ventilation, and diet.  They all appear to be complaints—titled "Grievance Officer" with a corresponding document number— submitted over the MCDC KIOSK system.  While the MCDC's stated grievance procedure requires a written grievance after a complaint is filed and responded to over the KIOSK system, Defendants do not argue Plaintiff failed to comply with this step of the MCDC grievance procedure.  (ECF No. 37-5).  This is even so despite the fact no written grievance forms are included on the summary judgment record before the Court.  Accordingly, the Court finds no distinction among the complaints Plaintiff filed related to the black mold, ventilation system, or diabetic trays.

feeds            him.                  Grievance             #12,497,541          states              in          full:

## GRIEVANCE OFFICER – #12,497,541

| From: | RAY CALVERT ███████████ | Date Submitted: | 08/03/2022 7:45 AM |
|---|---|---|---|
| Housing Area: | Max-A | Date Received: | 08/03/2022 12:43 PM |
| Assigned To: | KITCHEN | Status: | **CLOSED** |
| Result: | None Selected | Section: | N/A |

**Request**

As I am sure you all are aware that a diabetic must eat according to a specific prescribed diet. However, due to the kitchen blatant disregard for our health. I refuse to eat what you are feeding me because a great majority of it is food that turn to sugar...ie pasta, white bread, and other starches. Food that are bad for a person who is a diabetic, like myself. I'm asking that the kitchen change the way it feed us. This is the second day, fourth meal I have refused. I am still eating, but refuse to eat what are being feed from the kitchen.

**Note by ADMIN G. OFFICER on 08/03/2022 at 9:33 AM**

I have forwarded you request to the appropriate authority.

**Response by KITCHEN K. KITCHEN on 08/03/2022 at 12:46 PM**

I HAVE ADDRESSED THIS MATTER WITH THE SAID INMATE. HE IS THE ONLY INMATE THAT IS DIABETIC COMPLAINING ABOUT THE FOOD. HE HAS BEEN TOLD THAT HE IS GETTING WHAT IS APPROVED BY THE DIETICIAN AND IF IT IS NOT WHAT HE LIKES HE NEEDS TO ORDER WHAT HE WANTS OFF OF COMMISSARY. HE CANT HAVE HIS WAY. HE KNOWS HES IS NOT BEING TREATED UNFAIRLY HE JUST WANTS TO COMPLAIN. BUT THERE IS NOTHING WRONG WITH THE DIABETIC TRAYS.

(ECF No. 37-3, p. 11).  Additionally, this is the third out of five separate grievances filed by

Plaintiff over his diabetic diet.  (ECF Nos. 37-3, pp. 11, 22, 23, 24, 25).

Furthermore, Jail Administrator Al Landreth testified in his Affidavit, in response to

Plaintiff's grievances, the MCDC staff discussed Plaintiff's concerns regarding his tray with the

dietician and it was confirmed he was receiving a properly nutritious meal sufficient for diabetics.

(ECF No. 37-9, p. 4).  Clearly, not only did Plaintiff's grievances provide enough information for

investigations into his complaints, the staff at the MCDC actually investigated Plaintiff's

complaint and responded to it.

Accordingly, the Court finds as a matter of law that Plaintiff exhausted his diet claim

pursuant to the MCDC grievance procedure as argued by Defendants.

22

### C.  Injury in Fact

However, Plaintiff's claim regarding his diet must fail because Plaintiff did not allege any injury related to his diet.[11]  In order to establish standing to sue, Plaintiff must show he "suffered an injury in fact that is fairly traceable to the defendant's challenged action."  *Cross v. Fox*, 23 F.4th 797, 800 (8th Cir. 2022).  The Court must be able to redress the injury suffered by Plaintiff. *Id.*  Plaintiff did not allege any injury from his diet in his Amended Complaint, and the summary judgment record is also devoid of any claimed injuries from the inappropriate diabetic diet.[12]  To the contrary, in one of Plaintiff's grievances on the record he states: "This is the second day, fourth meal I have refused.  I am still eating, but refuse to eat what … being fed from the kitchen."  (ECF No. 37-3, p. 11) (errors in original).  Accordingly, the Court finds Plaintiff's claim regarding his diet fails as a matter of law for lack of standing.

### V.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 37) is **GRANTED in part** and **DENIED in part**.  Specifically:

1) Defendants' Motion for Summary Judgment regarding Plaintiff's claims relating to lighting and water is **GRANTED** and these claims are **DISMISSED** without prejudice for failure to exhaust administrative remedies;

---

[11] Defendants also argue Plaintiff failed to state an injury in fact related to his claims of black mold and poor ventilation, however, as enumerated in the factual background section, Plaintiff not only alleges injuries caused by the black mold and poor ventilation the summary judgment record includes medical requests and visits related to those alleged injuries.  Supra Section II.

[12] Furthermore, Plaintiff states in his Response Brief: "Plaintiff does give a grievance about his diet but that's not what he arguing in claim 1 or claim 2.  Plaintiff argument is about the 'Black Mold' problem in the showers and cells."  (ECF No. 47, p. 5) (errors in original).

2) Defendants' Motion for Summary Judgment regarding Plaintiff's claim relating to his diet is **GRANTED** and these claims are **DISMISSED** without prejudice for failure to state a claim upon which relief can be granted;

3) Defendants' Motion as to Plaintiff's Claims One and Two for exposure to black mold and poor ventilation in both individual and official capacities against Defendants Golden, Adams, and Hanning are **DENIED** without prejudice; and

4) Defendants may file a second motion for summary judgment, as to Plaintiff's Claims One and Two, based the standard set out in *Stearns v. Inmate Servs. Corp., et al.,* discussed above, on or before **May 20, 2024**.[13]

IT IS SO ORDERED this 21st day of March 2024.

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

---

[13] If the Defendant does not intend to file second motion for summary judgment they should notify the Court by the same deadline.